# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:  SAWTEK, INC. SECURITIES
LITIGATION

                                              **Master File No.**
                                              **Case No.  6:03-cv-294-Orl-31DAB**

**This Document Relates to:**
**ALL CASES**                                 **Class Action**
                                              **(Consolidated)**

_____

## ORDER

This case is before the Court on the Motion to Dismiss the First Amended Class Action

Complaint (Doc. 44) filed by Defendants Kimon Anemogiannis ("Anemogiannis"), Gary Monetti

("Monetti"), Raymond Link ("Link") (collectively, the "Individual Defendants"), and Sawtek, Inc.

("Sawtek").  In resolving this matter, the Court has also considered Lead Plaintiffs' Memorandum of

Law in Opposition (Doc. 49) and the Supplemental Briefs filed by both sides (Docs. 79, 81).  The

Court held hearings in this matter on November 21, 2003 and August 25, 2005.

## I.      Background

Sawtek, a Florida corporation, designs, manufactures and markets electronic signal processing

components, primarily for use in the wireless communications industry.  (Doc. 37 at 3).  The

Individual Defendants were Sawtek executives for some or all of the period between January 27, 2000

and May 24, 2001.  (Doc. 37 at 3-4).  The Lead Plaintiffs — Libra Advisors, LLC ("Libra Advisors")

and Jay B. Heimowitz ("Heimowitz") — acquired Sawtek common stock on the open market between

January 27, 2000 and May 24, 2001 and propose to represent a similarly situated class of investors.

(Doc. 37 at 1-2).

According to the Lead Plaintiffs, in early 2000 the Defendants began a scheme of engaging in improper business practices, making false and misleading statements, and concealing material adverse facts about Sawtek's operations.  (Doc. 37 at 5).  The scheme, which artificially inflated Sawtek's stock price, was intended to — and did — culminate in a July 2001 merger with TriQuint Semiconductor, Inc. ("TriQuint").  (Doc. 37 at 3).  As a result of the merger, each Sawtek shareholder received 1.1507 shares of TriQuint stock for each share of Sawtek stock.  The Lead Plaintiffs contend that, in the absence of the Defendants' scheme, the merger would likely have resulted in a less favorable stock-swap ratio, or might not have occurred at all.  (Doc. 37 at 6).  On March 12, 2003, plaintiff George J. Macauley, on behalf of a putative class of investors, brought suit for securities fraud allegedly committed by the Defendants between January 7, 2000 and May 24, 2001.  (Doc. 1).  On May 28, 2003, the Court consolidated several related cases into this lead case.  (Doc. 25).  On June 3, 2003, the Court entered an order appointing Libra Advisors and Heimowitz as lead plaintiffs in the consolidated case.  Thereafter, the Lead Plaintiffs filed their First Amended Consolidated Class Action Complaint (the "First Amended Complaint").  (Doc. 37).

In the First Amended Complaint, the Lead Plaintiffs asserted that the fraud had occurred between January 27, 2000 and May 24, 2001 (the "Class Period") and proposed to represent a class of investors who had purchased or otherwise acquired Sawtek securities during that period.  (Doc. 37 at 1-2).  In their first claim, the Lead Plaintiffs accuse Sawtek and the Individual Defendants of violating Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") by virtue of the alleged scheme to inflate Sawtek share prices.  (Doc. 37 at 46).  In the remaining claim, they seek to assert liability against the Individual Defendants pursuant to Section 20(a) of the Exchange Act.

On September 3, 2003, the Defendants moved to dismiss the First Amended Complaint on statute of limitations and other grounds.  (Doc. 44).  After a hearing on November 21, 2003, the Court denied the motion in part, finding that the longer limitations period established by the Public Company Accounting Reform and Investor Protection Act of 2002, 28 U.S.C. § 1628, Pub. L. No. 107-204, 116 Stat. 745 (2002) (the "Sarbanes-Oxley Act") applied in the instant case.  (Doc. 59).  The Court reserved ruling on the remainder of the motion to dismiss and stayed the case to allow the Lead Plaintiffs to appeal the limitations issue.  (Doc. 59 at 11).  That stay expired without a resolution of the interlocutory appeal.

The Court held a second hearing on August 25, 2005 to address the Defendants' remaining arguments in favor of dismissal: 1) that the Lead Plaintiffs have failed to adequately plead scienter; 2) that the Lead Plaintiffs have failed to adequately plead accounting fraud; and 3) that the Defendants' forward-looking statements are entitled to safe harbor protection.  In addition, both at that hearing and in their supplemental briefs, the parties addressed the issue of whether the Lead Plaintiffs had properly pleaded loss causation.

## II.    Pleading Standards

### A.    Motion to Dismiss

In ruling on a motion to dismiss this Court must view the allegations of the complaint in the light most favorable to the plaintiff.  *Scheuer v. Rhodes*, 416 U.S. 232 (1974).  The Court will take the complaint's allegations as admitted by the Defendant and will liberally construe them in the Plaintiff's favor. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  The Court will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts

that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003); *see also U.S. ex rel. Carroll v. JFK Med. Ctr.,* 2002 WL 31941007, at *2 (S.D. Fla. Nov. 15, 2002) ("Court need not accept facts that are internally inconsistent, facts that run counter to facts which the Court may take judicial notice of, conclusory allegations, unwarranted deductions or mere legal conclusions"); *Harding v. Winn-Dixie Stores, Inc.*, 907 F. Supp. 386, 389 (M.D. Fla. 1995) ("the court will not accept conclusory allegations or legal conclusions masquerading as factual conclusions").  Normally, a court must limit its consideration to the pleadings and written instruments attached as exhibits thereto; however, where a complaint alleges violations of securities laws, the court may consider certain other materials, such as documents filed with the Securities Exchange Commission ("SEC").  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-81 (11th Cir. 1999); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).

### B.    The Securities Exchange Act

Section 10(b) of the Securities Exchange Act of 1934 (the "Act") forbids (1) the "use or employment ... of any ... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) in contravention of Securities and Exchange Commission rules and regulations.  15 USC § 78j(b).  Commission Rule 10b-5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 CFR § 240.10b-5 (2004).  To state a claim for securities fraud under these provisions, a plaintiff must allege

-4-

that (1) the defendant made misstatements or omissions (2) of a material fact (3) with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. *See*, *e.g.*, *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996); *Ross v. Bank South, N.A.*, 885 F.2d 723, 728 (11th Cir. 1989). Under Section 20(a) of the Act, liability may be imposed on a "controlling person" where a securities violation is found. *See Brown v. Enstar Group, Inc.*, 84 F.3d 393, 395-97 (11th Cir. 1996). A controlling person is one who has "the power to control the general affairs of the entity primarily liable at the time the entity has violated the securities laws and [who has] the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Id.* at 396 (quoting *Brown v. Mendel*, 864 F.Supp. 1138, 1145 (M.D.Ala. 1994) (quotations and alterations omitted)).

### C.    The Reform Act

In 1995, Congress enacted the Private Securities Litigation Reform Act (the "Reform Act") in an effort to curb abusive securities litigation. *Bryant*, 187 F.3d at 1286; 15 U.S.C. § 78u-4(b)(1). The Reform Act imposed a heightened pleading requirement for securities fraud claims. Traditionally, courts measured the sufficiency of a plaintiff's allegations of securities fraud against the requirements of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that "in all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The requirements of Rule 9(b) are met where the plaintiff sets forth: (1) the content of the precise statement or omission; (2) who made, or failed to make, the statement; (3) where the statement was, or should have been, made; (4) when the statement was, or should have been, made; and (5) what the

defendants gained as a consequence.  *See Brooks v. Blue Cross and Blue Shield of Fla.*, 116 F.3d 1364, 1371 (11th Cir. 1997).

The Reform Act augmented the Rule 9(b) standard by requiring that plaintiffs "specify ... the reason or reasons why the statement is misleading."  15 U.S.C. § 78u4(b)(1).  In addition, where allegations in a securities complaint are made on information and belief, the complaint must state with particularity the facts on which the belief are formed.  *See id.*  Finally, plaintiffs must support their scienter allegation by stating "with particularity facts giving rise to a strong inference that the defendant made the misrepresentations or omissions ... knowingly" or in a "severely reckless manner." 15 U.S.C. § 78u-4(b)(2).; 15 U.S.C. § 78(j)(b); *Bryant,* 187 F.3d at 1281-87.  To successfully aver severe recklessness, the plaintiff must provide more than a "showing of mere motive and opportunity." *Id.* at 1285-87 (stating that allegations of motive and opportunity, without more, will not demonstrate the requisite scienter).  Rather, "[s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Id.* at 1282 n. 18 (quoting *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989)).

## III.    Legal Analysis of the First Amended Complaint

The First Amended Complaint relies in large part on allegations made by an anonymous former Sawtek employee referred to as "Confidential Witness #1" or "CW1".  CW1 worked for Sawtek as a "production planner" from early 2000 through the fall of 2002.  (Doc. 37 at 7).  According to the

First Amended Complaint, CW1 was responsible for creating and compiling production schedules for Sawtek, duties that required "intimate and detailed knowledge" of Sawtek's "current and forecasted sales and inventory at all times." (Doc. 37 at 7).

According to CW1, Sawtek employed a "QAD IT system" called Forecast 100 that allowed it to generate accurate forecasts of the amount of product it would need to manufacture to meet demand, stretching three months into the future. (Doc. 37 at 7). As early as February 2000, according to CW1, there was a significant drop in sales forecasts.

The Lead Plaintiffs contend that the drop in sales forecasts was due, at least in part, to Sawtek's customers having amassed unnecessarily large inventories as a result of Sawtek's aggressive (and at least in some instances, improper) sales practices. (Doc. 37 at 8-9). These practices included: "pulling in" orders – i.e., using "discounts, liberal return policies, or other incentive agreements" to generate sales in the current fiscal quarter that would not otherwise have been made until a future quarter (Doc. 37 at 9); intentionally shipping products that the recipients had not ordered, allowing Sawtek to improperly record the revenue – and, the Lead Plaintiffs claim, forcing Sawtek to offer discounts to convince customers to keep the merchandise (Doc. 37 at 11); "slow-boating" of orders – i.e., intentionally using very slow delivery methods near the end of a quarter, allowing Sawtek to record the revenue in the earlier quarter (when the goods shipped) even though the customer did not wish to receive the goods till the later quarter (Doc. 37 at 14); and utilizing the two-hour time difference between the Sawtek office in Florida and another in Costa Rica to improperly "extend" the quarter (by operating out of the Costa Rica office for two hours after the quarter closed in Florida)

(Doc. 37 at 14-15).  The Lead Plaintiffs also contend that a competitor, Qualcomm, developed a superior product in 2000, further dampening Sawtek sales forecasts.  (Doc. 37 at 15).

The Lead Plaintiffs allege that, despite knowing that their customers were already overloaded with Sawtek inventory as a result of these practices, throughout 2000 and early 2001 the Defendants made public statements and filed documents with the SEC predicting continued strong sales.  (Doc. 37 at 15-32).  In February 2001, Sawtek entered into formal merger negotiations with TriQuint.  (Doc. 37 at 30).  On May 15, 2001, the Defendants issued a press release announcing that the directors of the two companies had approved a merger agreement under which each Sawtek shareholder would receive 1.1507 shares of TriQuint common stock for each share of Sawtek common stock.  (Doc. 37 at 33).

On May 23, 2001, Sawtek issued a press release (the "May 23 announcement") announcing that it was revising its revenue and profits forecasts downward for the quarter ending June 30, 2001. (Doc. 37 at 33).  The press release attributed the revision to a recent downturn in the wireless communication sector, making no mention of Sawtek's allegedly improper sales practices or their impact on its customers' inventories.  (Doc. 37 at 33).  The Lead Plaintiffs claim that Sawtek's stock price dropped from $28.25 to $23.39 per share in response to the May 23 announcement.  (Doc. 37 at 33).  The Lead Plaintiffs contend that the May 23 announcement revealed the effects of Sawtek's fraud to the market and resulted in damage to them.  (Doc. 79 at 7).  The shareholders of Sawtek and TriQuint approved the merger in July 2001.  (Doc. 37 at 39).

The Court now turns to the alleged pleading deficiencies raised by the Defendants in their motion to dismiss.

**A.      Scienter**

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 1381 n.12, 47 L.Ed.2d 668 (1976).  A plaintiff alleging securities fraud establishes scienter by proving that the defendants acted with knowledge or severe recklessness.  *Broad v. Rockwell Int'l Corp*, 642 F.2d 929, 961 (5th Cir. 1981), *cert. den.*, *Broad v. Rockwell Int'l Corp.*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). A defendant's omissions or misrepresentations are severely reckless only if they (1) involve an extreme departure from the standards of ordinary care, and (2) present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.  *Id.* at 961 - 62.  In a Section 10(b) case, plaintiffs must support their scienter allegation by stating "with particularity facts giving rise to a strong inference that the defendant made the misrepresentations or omissions ... knowingly" or in a "severely reckless manner."

The Lead Plaintiffs contend that the following contained false or misleading statements:

1.  Sawtek's Form 10-Q for the quarter ended December 31, 1999 and the press releases issued in connection with it.  (Doc. 37 at 15-18).  This Form 10-Q was filed with the SEC on February 10, 2000.  (Doc. 37 at 16).

2.  Sawtek's Form 10-Q for the quarter ended March 31, 2000 and the press releases issued in connection with it.  (Doc. 37 at 19-21).  This Form 10-Q was filed on April 19, 2000.  (Doc. 37 at 19).

3. Sawtek's Form 10-Q for the quarter ended June 30, 2000 and the press releases issued in connection with it. (Doc. 37 at 22-23). This Form 10-Q was filed on July 17, 2000. (Doc. 37 at 22).

4. Sawtek's Form 10-K for the fiscal year ended September 30, 2000, and the press releases issued in connection with it. (Doc. 37 at 23-26). This Form 10-Q was filed on November 13, 2000. (Doc. 37 at 25).

5. Sawtek's press release in response to Qualcomm's announcement that it had developed a new technology that would eliminate the need for some of Sawtek's products. (Doc. 37 at 26-27). Sawtek announced that it believed that the new Qualcomm technology would have little or no impact on its 2001 revenues or profits. (Doc. 37 at 26).

6. Sawtek's January 25, 2001 press release (the "January 25 announcement") announcing financial results for quarter ended December 31, 2000 and projecting reduced sales for the next quarter "due to the slow down in the economy and in the wireless industry, lower prices, inventory build-up from last quarter, and guidance from the major wireless phone manufacturers for the quarter ended March 31, 2001." (Doc. 37 at 27-28).

-10-

7.  Sawtek's Form 10-Q for the quarter ended December 31, 2000, filed January 29, 2001.  (Doc. 37 at 28-30).

8.  Sawtek's April 9, 2001 press release (the "April 9 announcement") announcing disappointing financial results for the quarter ended March 31, 2001 "due to the continued unfavorable market conditions" and stating that "[w]e have been adversely impacted by the downturn in [the wireless and telecommunication] markets resulting in lower sales, lower gross margin, and lower net income for the quarter."  (Doc. 37 at 30-31).

9.  Sawtek's Form 10-Q for the quarter ended March 31, 2001, filed with the SEC on April 27, 2001.  (Doc. 37 at 31-32).

In regard to each of these statements other than number 5, the Lead Plaintiffs make substantially identical allegations as to why they were false and misleading: 1.) the "Risk Factors and Uncertainties" section of each Form 10-Q failed to reveal that Sawtek's customers were overloaded with Sawtek product; 2.) a warning in each Form 10-Q that customer cancellations could adversely affect operating results failed to reveal that Sawtek was already experiencing "push-outs" of orders; 3.) another warning in each Form 10-Q that Sawtek's stock price could be affected by variations in its customers' operating results failed to reveal that Sawtek's customers' operating results had already "been bloated" by Sawtek's use of "pull-ins" and shipments of unordered products; 4.) each Form 10-

Q failed to reveal that Sawtek was using "pull-ins", shipping unordered merchandise, and experiencing push-outs; and 5.) each Form 10-Q violated SEC regulations imposing a duty to disclose trends likely to have a material impact on Sawtek's sales by failing to reveal that its customers' overloaded inventories would prevent it from continuing its sales and earnings trends.  The Lead Plaintiffs also allege that statement number 5 was false and misleading because the Defendants knew Qualcomm's technology was superior and would eclipse that of Sawtek.  (Doc. 37 at 27).

The Defendants contend that the Lead Plaintiffs have failed to plead, with particularity, facts giving rise to a strong inference that the alleged misrepresentations and omissions were made knowingly or in a severely reckless manner.  Moreover, the Defendants argue, the Lead Plaintiffs have made allegations that utterly contradict such an inference.  The Lead Plaintiffs quote the January 25 announcement, for example, which predicted reduced sales in the next quarter due to an industry-wide slowdown, lower prices and higher inventories.  (Doc. 37 at 28).  The April 9 announcement, also quoted by the Lead Plaintiffs, announced financial results even more disappointing than those predicted in the January 25 release, attributing them to a downturn in the wireless telecommunications market.  (Doc. 37 at 30).

The Lead Plaintiffs argue that the January 25 and April 9 announcements do not counteract a strong inference of scienter, because they did not reveal the Defendants' misdeeds and were therefore materially misleading, and because the Defendants made other allegedly misleading statements during this time frame.  This argument misses the mark, for at least two reasons.  First, the issue is whether the Lead Plaintiffs have met their pleading burden with regard to scienter, not whether

the Defendants have rebutted such an inference.  Second, the Lead Plaintiffs cannot establish scienter by simply repeating their allegations that the Defendants made false statements.

By pleading that the Defendants made statements that warned the market of declining sales and worsening market conditions, the Lead Plaintiffs contradict any inference that the Defendants made the other statements fraudulently or recklessly.  In addition, so far as the First Amended Complaint reveals, the Defendants made these expectation-deflating warnings before selling any Sawtek shares. This further contradicts an inference that the Defendants were acting recklessly or committing fraud to boost the price of Sawtek shares.

The Lead Plaintiffs respond that the Individual Defendants' failure to sell stock during the Class Period was not significant, because the scheme's objective was a merger, not merely stock sales. However, this argument is merely an exercise in semantics.  The Lead Plaintiffs' theory is that the Defendants propped up the Sawtek share price *to increase the prospects of a merger*.  As such, any announcement likely to undercut the share price was significant, because it was also likely to undercut the merger.  Though not dispositive, the Defendants' willingness to make such announcements before reaping the benefits of their alleged scheme is therefore relevant.

This same analysis is also applicable to the Defendants' May 23, 2001 announcement of disappointing results, which led to the share-price declines of which the Lead Plaintiffs now complain. The Lead Plaintiffs argue that the Defendants should get no credit for the May 23 announcement, because they had "sealed" the merger deal on May 15 and the May 23 announcement gave TriQuint little legal basis to terminate the merger.  (Doc. 49 at 17).  The Lead Plaintiffs assert that Delaware law governed the merger agreement and that, shortly after the May 23 announcement, "Delaware's

-13-

Court of Chancery re-affirmed the difficulty TriQuint might encounter in terminating a merger agreement for some purported material adverse effect or breach of a warranty of representation." (Doc. 49 at 14).   In support of this pronouncement, the Lead Plaintiffs cite *In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14 (Del. Ch. 2001).  However, the Lead Plaintiffs have made no effort to compare the specifics of this case to the situation before the *IBP Shareholders* court – which was, in any case, applying the law of New York, not Delaware.  *See id.* at 54 (stating that "[t]he Merger Agreement's terms are to be interpreted under New York law").   The Court does not find this argument persuasive.

The Lead Plaintiffs also point to allegations that, they claim, detail "a severely reckless, if not consciously wrong, course of conduct." (Doc. 49 at 17).  The Lead Plaintiffs point to their allegations that Sawtek failed to disclose "known adverse trends, i.e., that Sawtek's customers were choking on excess inventory;" that Sawtek knew its sales practices were cannibalizing future quarters but continued to tout rising prospects; and that Sawtek engaged in "gross departures" from Generally Accepted Accounting Principles ("GAAP").  (Doc. 49 at 17).  However, as noted above, the Lead Plaintiffs cannot establish the necessary strong inference of scienter by simply repeating their allegations.  Such allegations are not the particularized facts required by the Reform Act, and they are not supported by such particularized facts.

In its Supplemental Memorandum, the Lead Plaintiffs point to several other allegations that, they contend, demonstrate the Defendants' scienter.    (Doc. 79 at 5).   In each instance, the Lead Plaintiffs misrepresent the contents of the First Amended Complaint or the implications that can reasonably be drawn from it.   The Lead Plaintiffs point to their allegation that Defendant

Anemogiannis received a copy of a February 23, 2001 e-mail that detailed how Sawtek customers were pushing out their orders, and the effects that these push-outs might have.  (Doc. 37 at 14). However, there is nothing to indicate that the push-outs had anything to do with improper sales practices, much less to do with fraud.  Simply showing that one of the Defendants knew about push-outs does nothing to establish scienter.

The Lead Plaintiffs also point to their allegations that two of the Defendants attended monthly sales meetings, but there is no indication that the alleged fraud or anything else improper was revealed at these meetings.  Finally, the Lead Plaintiffs contend that the First Amended Complaint contains allegations that Sawtek employees "openly joked about the fraud at Sawtek."  (Doc. 79 at 5).  But the jokes were about customers "unloading" product on Sawtek by falsely alleging it was defective, not about Sawtek committing fraud.  (Doc. 37 at 13).  These allegations do not establish the necessary scienter.

**B.      Accounting**

The allegations in the First Amended Complaint are based on information and belief.  (Doc. 1 at 1).  The Defendants contend that the Lead Plaintiffs have failed to meet their obligation, as to each statement they believe to have been misleading, to "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  As the Defendants point out, the Lead Plaintiffs have not identified particular transactions where revenues were improperly recorded.  Similarly, the Lead Plaintiffs have not identified a particular transaction where Sawtek pulled in any revenue from future quarters or where a Sawtek customer pushed out a delivery date.  They also have not provided the

names of the customers involved in any such transactions, when they occurred, or the approximate amounts of money or inventory involved.

The Lead Plaintiffs respond that they have provided sufficient details from CW1 to meet the Reform Act's pleading requirement.  The Lead Plaintiffs assert that these details "include Sawtek's shipping to Motorola and Celestica product that neither company ordered simply to book the shipped product as revenue for one quarter, knowing that product would be returned or discounted in the next." (Doc. 49 at 22).  In support of this assertion, the Lead Plaintiffs cite paragraphs 29 and 30 of the First Amended Complaint.  But a review of those paragraphs belies that assertion.

In paragraph 29, Sawtek is alleged to have regularly and intentionally shipped unordered product to those customers, and the allegation is attributed to CW1.  (Doc. 37 at 11).  However, the paragraph documents that CW1 believed such shipments "were intentional, and not a mistake, because he specifically recalls hearing that Sales staff were being instructed to quickly ship the orders to Motorola and Celestica."  (Doc. 37 at 11).  Hearing that orders were to be shipped speedily is not enough to support a belief that orders were being shipped improperly, much less a belief that this was being done to pull in revenue that would be offset in the next quarter by discounts or returns.  And the remainder of the cited paragraphs does not provide the particularized support the Lead Plaintiffs require.  Instead it consists solely of additional allegations, most of which are not attributed to CW1 and none of which are supported by particularized facts.[1]

--------

[1]The closest thing to such a particularized fact occurs in paragraph 30, where the Lead Plaintiffs assert that CW1 "recalls that the quantities [of unordered product shipped to Motorola] were large enough to 'have an impact' on Sawtek's quarterly results." (Doc. 37 at 11).  This statement is far too vague to provide support for the Lead Plaintiffs' allegations of accounting fraud.

This pattern of unsupported allegations is repeated throughout the First Amended Complaint. For example, the Lead Plaintiffs contend they have met their pleading burden in part by providing particularized facts as to how much product Sawtek's customers received as a result of the improper transactions.  (Doc. 49 at 19).  However, the portions of the First Amended Complaint they cite in support of this contention simply state that Motorola accounted for certain percentages of Sawtek's total net sales in preceding years.  (Doc. 37 at 16, 25).  There is no indication that a single one of those sales resulted from any improper practices.[2]

The Court notes that the First Amended Complaint does not contain certain allegations that regularly crop up in securities fraud cases and that would support the proposition that a fraud occurred at Sawtek.  For example, there is no allegation that the alleged misdeeds at Sawtek were ever publicly revealed.[3]  There is no allegation that an audit uncovered any problems or that Sawtek was ever forced to restate its earnings.  The Lead Plaintiffs do not allege that any of the Individual Defendants (or anyone else at Sawtek, for that matter) were indicted or forced to resign.  Though allegations of this type are not required, their absence robs the Lead Plaintiffs of a source of particularized factual support commonly available in similar cases.

More problematic is the fact that the Lead Plaintiffs have failed to provide support for the linchpin of their case — the claim that the Defendants knew or should have known that Sawtek's sales growth was unsustainable.  In the absence of such knowledge, the Defendants would not have had a

---

[2]In fact, the cited portions of the First Amended Complaint are simply quotations from a Form 10-Q and a Form 10-K, respectively, on the topic of Sawtek's largest customers.  (Doc. 37 at 19, 22).

[3]The May 23 announcement, which preceded the price drop at issue here, attributed the poor financial results to industrywide problems, not misdeeds at Sawtek.  (Doc. 37 at 33).

duty to disclose the allegedly improper sales practices, and the statements at issue would not have been false or misleading because of the lack of such disclosures.  But how could Sawtek know its customers were "choking" on inventory when the customers themselves did not (and kept buying)?  Why would Sawtek know exactly how much product Motorola (and every other customer) would need for the next three months when Motorola itself did not?  There is nothing to suggest that CW1 possessed this level of information about Sawtek's customers' inventories, and the Lead Plaintiffs have provided nothing else – no audit results, no newspaper stories – to explain how anyone else at Sawtek would have it.

### C.    Safe Harbor

The Reform Act permits defendants to avoid liability for so-called "forward-looking statements" that prove false if the statements are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A).  To qualify for this safe harbor, the defendants need not identify all factors that might cause such a result, or even the particular factor that causes the forward -looking statement to not come true.  *Harris v. Ivax Corp.*, 182 F.3d at 807.  "In short, when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment".  *Id.* at 807.  Even if the forward-looking statement has no accompanying cautionary language, the defendant is entitled to safe harbor unless the plaintiff proves that the defendant made the statement with actual knowledge that it was false or misleading.  15 U.S.C. § 78u-5(c)(1)(B).

The Defendants contend that their alleged misrepresentations occurred in forward-looking statements that were accompanied by meaningful cautionary language and are therefore protected by

the safe harbor.  (Doc. 45 at 25).  The Lead Plaintiffs do not dispute the Defendants' characterization of the statements as forward-looking.  Instead, they argue that the statements and accompanying cautionary language were false or misleading when made, that the Defendants knew this when they made the statements, and that the safe harbor therefore does not apply.  (Doc. 49 at 24).

The Lead Plaintiffs have misinterpreted the law in several ways.  First, they assert that forward-looking statements cannot ever be subject to the safe harbor if the speaker knew at the time that the statements were false or misleading.  (Doc. 49 at 24).  The case they cite in support of this proposition reaches the opposite conclusion.  *See In re SeeBeyond Technologies Corp. Sec. Litig.*, 266 F.Supp.2d 1150, 1166 (C.D.Cal. 2003) (stating that 15 U.S.C. § 78u-5(c)(1)(A) "may still provide safe harbor where cautionary language is used, even if the defendant has actual knowledge that a statement is false or misleading.").  The plain language of the statute confirms this interpretation:  The applicable provisions provide safe harbor when the statement is accompanied by meaningful cautionary language, 15 U.S.C. § 78u-5(c)(1)(A), *or* when a plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading, 15 U.S.C. § 78u-5(c)(1)(B.  Defendants only have to satisfy one prong, not both, to avoid liability.   In addition, the United States Court of Appeals for the Eleventh Circuit has implicitly rejected this argument.  *See Harris*, 182 F.3d at 808 n.10 ("The statutory definition of 'forward-looking statement' does not refer at all to the defendants' knowledge of the truth or falsity of the statement, however; such knowledge is relevant only to liability in the safe harbor, and even there only when there is inadequate cautionary language.").

The Lead Plaintiffs next argue that cautionary language that is itself false and misleading cannot qualify as "meaningful" for purposes of entitlement to safe harbor.  In support of this, the Lead

Plaintiffs cite *Sherleigh Associates, LLC v. Windmere-Durable Holdings, Inc.*, 178 F.Supp.2d 1255, 1273-74 (S.D.Fla. 2000), contending that the court in that case rejected a safe harbor argument "because [the] complaint alleged that defendants knew when they made the forward-looking statements that those statements were false when made and rejecting the defendants' safe harbor argument also because the complaint alleged that the cautionary language was itself false and misleading". (Doc. 49 at 24, n. 57). However, the Lead Plaintiffs have misstated the holding of this case. The *Sherleigh Associates* court did reject the defendants safe harbor argument, but only after a thorough analysis of the cautionary language:

> After comparing the Amended Complaint's factual allegations and the various cautionary statements within the ambit of the Reform Act's safe harbor provision, the Court finds the cautionary language, both in the aggregate and when analyzed for specifics, when cast against the alleged omissions and misstatements here, did not fairly and adequately warn potential investors of the alleged risks associated with investing in Windmere securities. Thus, the Court finds the Reform Act's safe harbor provision does not apply to the allegations in the Amended Complaint.

*Id.* at 1274. If the plaintiffs' allegations of knowing falsity were enough to nullify any otherwise meaningful cautionary language, the *Sherleigh Associates* court would not have needed to engage in this comparative analysis.

Finally, the Lead Plaintiffs argue that Sawtek's cautionary statements were false and misleading, and therefore not meaningful, "because they all omitted to disclose Sawtek's channel stuffing; pull-in's; push-out's; and Sawtek's shipping product to customers that customers had not ordered." (Doc. 49 at 22-23).[4] However, the Defendants are not required to list the particular factors

---

[4]The Lead Plaintiffs also assert that the Defendants do not challenge their contention that Sawtek's Form 10-Q for the quarter ended December 31, 1999 contained false and misleading cautionary language. (Doc. 49 at 25 n. 60). To the contrary, the Defendants argue that the cautionary language in that document entitles them to safe harbor. (Doc. 45 at 28).

that lead to operating results less rosy than those forecast in the forward-looking statements. *Harris*, 182 F.3d at 807. So long as the Defendants warned the Lead Plaintiffs of risks of a significance similar to those that were actually realized, they are entitled to safe harbor. *Id.*

The Lead Plaintiffs have made no effort to address the content of the Defendants' purportedly meaningful cautionary language, instead relying on their theory that allegations of knowing falsity would carry the day. After a review of the language at issue, the Court agrees with the Defendants' (essentially uncontradicted) assertion that the warnings met their burden to warn under the Reform Act, excusing the Defendants from liability.

### D.    Loss Causation

The Federal Rules of Civil Procedure require only that the complaint provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). This rule is not meant to impose a great burden upon a plaintiff. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-15, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). However, that short and plain statement must at least provide the Defendants with fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Accordingly, a plaintiff who has suffered an economic loss must provide a defendant with "some indication of the loss and the causal connection" between the defendant's conduct and that loss. *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Normally, a plaintiff in a Section 10(b) case cannot satisfy this loss causation requirement by merely alleging that he or she bought a security at an inflated price. *Id.* at 1631. Among other reasons, such an allegation does not necessarily establish

that the plaintiff has suffered a loss, as the plaintiff might resell before the relevant truth leaks out and

deflates the price. *Id.* at 1632.

In the First Amended Complaint, the Lead Plaintiffs repeatedly assert that they were damaged

because they bought Sawtek stock at inflated prices. For example, the Lead Plaintiffs propose to

represent a class of investors "who purchased or otherwise acquired Sawtek securities on the open

market from January 27, 2000 through and including May 24, 2001 *and were damaged thereby*."

(Doc. 37 at 1-2) (emphasis added). Toward the end of their initial claim – the Section 10(b) claim –

the Lead Plaintiffs assert that

> Lead Plaintiffs and the other members of the proposed Class acquired Sawtek common
> stock during the Class Period at artificially high prices and were damaged thereby.

(Doc. 37 at 45 - 46). At the conclusion of the 10(b) claim, the Lead Plaintiffs generally assert that the

class members "suffered damages in connection with their respective purchases and sales of [Sawtek]

securities during the Class Period." (Doc. 37 at 46).

Clearly, these allegations alone do not satisfy the loss causation requirement as set forth in

*Dura Pharmaceuticals*. They do not indicate the losses suffered by the class members or the

connection between the Defendants' conduct and those losses. Mostly, they simply recite that the

class members paid inflated prices for their Sawtek shares. Even the statement that mentions sales

makes no effort to establish causation.

The Lead Plaintiffs argue that their allegations regarding the Defendants' undisclosed sales

practices establish causation. They argue that the effects of those practices were realized on May 23,

2001, when Sawtek publicly lowered its sales and revenue forecasts by 30 percent, causing Sawtek's

stock price to drop from $28.25 per share to $23.39 a share. (Doc. 79 at 7). According to the Lead

Plaintiffs, this price drop damaged members of the proposed class who sold their shares after the May 23 announcement.  (Doc. 79 at 7-8).   The Lead Plaintiffs also argue that, although the Sawtek-TriQuint exchange ratio had been set prior to the May 23 announcement, that announcement caused TriQuint's share price to drop from $27.04 to $24.81, damaging class members who tendered their shares by reducing the value of the TriQuint shares they received in return.  (Doc. 79 at 8).

The Defendants disagree with these contentions, based in large part on statements made by Lead Plaintiffs' counsel at an earlier hearing that appear to contradict them.  (Doc. 81 at 4-10).  The Court finds that, at least in theory, the contentions described above adequately indicate a causal connection between the Defendants' conduct and the class members' losses.   However, those contentions are not reflected in the First Amended Complaint.  Moreover, those contentions do not square with the class the Lead Plaintiffs propose to represent, which consists of those who purchased Sawtek stock between January 27, 2000 and May 24, 2001.  (Doc. 37 at 111). Such a class would include shareholders who sold prior to the May 23 "revelation," thereby avoiding any losses due to the Defendants' alleged fraud.  Such a class would also include those who bought shares on the day after the May 23 announcement, who would not (under the Lead Plaintiffs' theory) have paid an inflated price for their stock.

IV.    **Conclusion**

It is not uncommon for defendants in securities fraud cases to complain that the case against them amounts to nothing more than a restatement in search of a fraud.  *See*, *e.g.*, *In re PSS World Medical, Inc. Securities Litig.*, 250 F.Supp.1335, 1341-42 (M.D.Fla. 2002).  The plaintiffs in this case have failed to produce even that much.

Even when viewed in the light most favorable to the Lead Plaintiffs, the scheme laid out in the First Amended Complaint makes no economic sense.  The Lead Plaintiffs' theory is that, beginning in October of 1999, the Defendants were so skilled in their sales practices that they were able to consistently sell large quantities of unwanted product to sophisticated customers such as Motorola – and that, by May of 2001, these customers' inventories became so bloated that demand for Sawtek's products crashed, causing its stock price to drop by 17 percent.  It defies logic to suggest that an entity could successfully operate in such a fashion for an extended period, with each quarter requiring ever-more-heroic pull-ins to replace the sales that were cannibalized in the previous quarter and to pad the results in the current quarter.  Further, as is obvious to anyone familiar with recent history, America's economy underwent a recession and the U.S. stock market suffered a substantial decline during the same time frame.[5]  The First Amended Complaint does almost nothing to support the notion that the Lead Plaintiffs' losses resulted from misdeeds or catastrophically successful sales practices rather than general market conditions.

As this Court has previously noted, the purpose of the securities laws is full and fair disclosure, so that investors can make informed decisions about purchasing publicly traded securities.  The laws are not designed to serve as an insurance policy for investors who knowingly assume a financial risk but now wish they had not.  Based on contents of the First Amended Complaint, and the arguments made by the Lead Plaintiffs in support of it, this case appears to be a classic example of the "fraud by hindsight" that the Reform Act was designed to eliminate.

---

[5]*During 2001, the broad U.S. stock market declined 11.46 percent, as measured by the Russell 3,000 Index.  The U.S. telecommunications sector fared even worse, falling 18.66 percent as measured by Barclay's U.S. Telecommunications Index (symbol "IYX").  In the first quarter of 2001 alone, the share price for Sawtek's largest customer, Motorola, fell approximately 25 percent.*

-24-

The Lead Plaintiffs have failed to provide particular facts to support an inference that any misrepresentations or omissions were made, much less that they were made knowingly or in a severely reckless manner.  The Defendants have established that the statements at issue were accompanied by meaningful forward-looking statements.  And the Lead Plaintiffs' loss causation theory, while plausible, is not reflected in the First Amended Complaint.  Thus, pursuant to the requirements of the Reform Act, the Defendants are entitled to dismissal of the Section 10(b) claims.  As controlling person liaiblity in this case depends upon Section 10(b) liability, the Section 20(a) claims must also be dismissed.

The Lead Plaintiffs' pleading failures in regard to scienter, the accounting fraud allegations, and loss causation would normally warrant an opportunity to amend the First Amended Complaint.  However, in light of the Court's determination that the allegedly false and misleading statements are protected by the safe harbor, such an amendment would be futile.  *See*, *e.g.*, *Harris*, 182 F.3d at 807-08 (affirming denial of leave to amend where district court found statements were subject to safe harbor).  Accordingly, it is

**ORDERED** that the Defendants' Motion to Dismiss the First Amended Class Action Complaint (Doc. 44) is **GRANTED IN PART**, and the case is **DISMISSED WITH PREJUDICE**.  The Clerk is directed to close the file.

**DONE** and **ORDERED** in Orlando, Florida on October 6, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

-25-

Copies furnished to:

Counsel of Record
Unrepresented Parties